**W. J. HUNTER, Plaintiff,**

v.

**The AFRO-AMERICAN COMPANY OF BALTIMORE CITY, a corporation, Defendant.**

**PALMETTO STATE VOTERS ASSOCIATION, Inc., Plaintiff,**

v.

**The AFRO-AMERICAN COMPANY OF BALTIMORE CITY, a corporation, Defendant.**

**Nos. 4761 and 4762.**

United States District Court
E. D. South Carolina, Florence Division.

Sept. 2, 1955.

Harold R. Boulware, Columbia, S. C., Cobb, Howard & Hayes, Washington, D. C., for defendant.

HOFFMAN, District Judge.

The foregoing two actions allege that the defendant caused or permitted to be published and circulated in its "South Carolina Edition" of "The Afro-American" certain defamatory and libelous statements, the source of which is attributed to one John H. McCray described in said newspaper as "Editor, South Carolina Edition". The actions were originally instituted in the Court of Common Pleas of the County of Darlington, and were removed to this Court by reason of diversity of citizenship and the amount in controversy.

Plaintiffs are initially confronted with a motion to quash alleging a defective and void service of process, in which motion the defendant appears specially. In the same motion defendant asserts that it "has not and never has done business in or engaged in business in the State of South Carolina", and that defendant had no agent or servants in said State upon whom legal service could be made. This portion of the motion may be considered as a motion to dismiss. Essentially, there are two pertinent questions for determination at this stage of the proceedings:

(1) Was the service of process valid?

(2) Was the defendant corporation "doing business" in South Carolina, thereby making the defendant amenable to suit in that State?

By agreement of counsel these matters were submitted and argued before the undersigned District Judge serving under designation. The pleadings, interrogatories, exhibits, affidavits and memorandums have all been carefully considered and counsel indicated that testimony in open court was unnecessary under the circumstances.

### The Service of Process

These cases were instituted by plaintiffs' filing the requisite complaints in the state court, whereupon process was

Bennett & Turnage, Florence, S. C., for plaintiff.

issued by the Clerk on January 31, 1955, and *mailed* by plaintiffs' counsel to the Secretary of the State of South Carolina. On February 1, 1955, the Secretary of State acknowledged receipt of the letters from plaintiffs' counsel enclosing two copies of the complaint and summons in each case, together with the required fee. The Secretary of State directed counsel's attention to § 10–424, Code of Laws 1952, which, in part, requires one copy to be sent by registered mail to the defendant corporation as the defendant had never domesticated in South Carolina. By registered letter, return receipt requested, counsel mailed a copy of the complaint and summons to the home office of the defendant corporation at Baltimore, Maryland, and thereafter filed an affidavit of compliance in the state court proceedings.

The South Carolina Code relating to service of process contains the following provisions:

§ 10–424

"If the suit be against a foreign corporation other than a foreign insurance company, the summons and any other legal paper may be served by delivering a copy to any officer, agent or employee of the corporation found at the place within this State designated by the stipulation or declaration filed by the corporation pursuant to § 12–721. *But if such foreign corporation transacts business in this State without complying with said section such service may be made by leaving a copy of the paper with a fee of one dollar in the hands of the Secretary of State or in his office* and such service shall be deemed sufficient service and shall have like force and effect in all respects as service upon citizens of this State found within the limits of the same if notice of such service and a copy of the paper served are forthwith sent by registered mail by the plaintiff to the defendant foreign corporation and the defendant's return receipt and the plaintiff's affidavit of compliance therewith are

filed in the cause and submitted to the court from which such process or other paper issued."

§ 10–404

"The summons may be served by the sheriff of the county in which the defendant may be found, *or by any other person not a party to the action.* The service shall be made and the summons returned, with proof of the service, to the person whose name is subscribed thereto, with all reasonable diligence. The person subscribing the summons may at his option by an endorsement on the summons fix a time for the service thereof and the service shall then be made accordingly."

§ 10–463

"Service by mail may be made where there is a regular communication by mail."

Defendant insists that *service by mail* on the Secretary of State is void and of no effect. Reliance is placed upon Gallant v. McKinney, D.C.S.D.Fla., 104 F. Supp. 277, a case from the Southern District of Florida which, at first blush, would appear to be controlling. The Florida statute, § 47.30, contains essentially the same provisions as South Carolina's § 10–424, and in Gallant the Court granted a motion to quash the purported service attempted by mailing a copy of the complaint and summons to the Secretary of State. Adopting the strict construction rule with respect to substituted service of process, the Court held that "service of such process" was intended to mean service by an officer authorized by law to serve a process, and did not include mailing by the plaintiff, or his attorney, to the Secretary of State.

Wholly aside from the provisions of South Carolina's § 10–463 providing for service by mail, it is well to note § 47.12 of the Florida statutes which provides, in part, as follows:

"*All process*, except that issuing from a justice of the peace court, *shall be served by the sheriff or any*

*constable of the county in the district in which it is to be served."*

As contrasted with § 10-404 of the South Carolina Code of Laws, it is observed that in South Carolina the summons may be served *"by any other person not a party to the action"*. In addition, § 10-438 of the South Carolina Code, after providing for service on the Secretary of State and other methods of substituted service, has this to say:

"In all cases other than those hereinbefore mentioned the summons shall be served by delivering a copy thereof to the defendant personally".

It is believed that the intent and purpose of South Carolina was to permit service by mail upon the Secretary of State, provided there is compliance with the other provisions of § 10-424. The motion to quash is denied.

### Doing Business

In any newspaper publishing business there are three essential functions which must be considered. They are:

(1) gathering news,

(2) obtaining advertisers and securing subscribers as a source of revenue with which to edit, print, and sell the news and advertisements in newspaper form, and

(3) the actual printing and circulations of the newspapers for sale.

The apparent division of authority among the various courts leads to the inevitable conclusion that there is no uniformity of opinion in determining whether or not a particular newspaper is "doing business" within a particular state. We must, therefore, look at the facts in each case, ever bearing in mind the essential functions of the business.

The Afro-American Newspapers are published primarily for members of the Negro race. The Afro-American Company of Baltimore City, the defendant herein, is a link in a chain of newspapers consisting of publications in Washington, D. C., Philadelphia, Pennsylvania, Newark, New Jersey, and Richmond, Virginia. The Maryland corporation prints, in Baltimore, seven separate weekly editions, the news content of the different editions varying only in items of interest to the area served. Local advertising may be purchased separately in any of the seven editions or in a combination of editions serving different areas. The seven editions are:

Four Star Edition—For distribution in Southern States except North Carolina, South Carolina, Virginia and West Virginia

Eight Star Edition—For distribution in Northern and Western States except Wisconsin

Wisconsin Edition—For distribution in Wisconsin

Two Star Edition—For distribution in Virginia and West Virginia

North Carolina Edition—For distribution in North Carolina

South Carolina Edition—For distribution in South Carolina

Nine Star Edition—For distribution in New England

The letterheads carry the imprint "Afro-American Newspapers" and all correspondence is signed in that manner. In small type, appearing immediately below the main heading, and in the order named, appears: Baltimore Afro-American, Washington Afro-American, Philadelphia Afro-American, New Jersey Afro-American, Richmond Afro-American, National Afro-American.

The executive offices are shown on the letterheads as "628 N. Entaw Street, Baltimore 1, Md". While there is an interchange of news and advertisements among the various "Afro" papers, there is no system of interchange with any other newspapers. The present circulation of the "South Carolina Edition" is 6300 copies.

Prior to March 7, 1954, one John H. McCray, a resident of Columbia, South Carolina, was the editor and publisher of "The Lighthouse and Informer", a newspaper printed and circulated in South Carolina primarily for Negro readers. While not in any sense binding upon the

defendant, it will be seen that by letter dated March 6, 1954, addressed "Dear Agent", McCray advised that he had accepted the "editorship of the South Carolina edition of The Afro-American". In effect, McCray announced a merger of the two newspapers, although this can be regarded as "sales talk". However, McCray did advise all agents as to how news item should be handled in the future, and notified them with respect to the price of the newspaper (15¢), the amount of commission for each sale (4¢) and the balance to be remitted (11¢). Actually "The Lighthouse and Informer" continued publication until the early summer of 1954 and then ceased operations.

Prior to employing McCray, defendant had established a network of agents and distributors throughout South Carolina. The status of one Warner, apparently employed by defendant before March, 1954, is not clearly revealed by the affidavits, interrogatories, or exhibits, but this question is not deemed relevant to a determination of the present issue.

That defendant caused the publication and circulation of the alleged libelous statement is admitted for the purpose of this preliminary proceeding. The particular article, printed in Baltimore and circulated in South Carolina, is significant in its title:

"Roving about Car'lina,
By John H. McCray, Editor,
S. C. Edition".

Despite the contract provisions hereinafter mentioned, it may well be that defendant is now estopped from denying that McCray was the "Editor" of the South Carolina Edition.

The written contract between McCray and the defendant corporation (described in said contract as "The Afro-American Company") is dated March 18, 1954. In substance it provides: (1) that defendant is known as "Employer" and McCray is known as "Employee", (2) that defendant desires to secure the services of the "Employee" for the purpose of servicing the present circulation [1] and to procure additional circulation in South Carolina, (3) the "Employee" agrees to exert every effort to build up defendant's circulation in South Carolina, and to service the present and future circulation, (4) the "Employee" agrees to visit agents and distributors as required; to set up agencies, distributors and newsboys as necessary; and "to see to it that they do not fall into arrears", (5) "Employee" agrees to "file a daily report of his activities and a weekly report summarizing activities, new sales, new orders, all accounts serviced and his program and itinerary for the next week", (6) "Employee" agrees to solicit advertising at rates and commissions determined by "Employer", (7) "Employee" agrees, subject to change, that Afro-American will be sold to distributors at 8½¢ per copy, and to carriers at 11¢ per copy, (8) "Employee" agrees to handle and service the Afro-American newspaper exclusively in South Carolina; that he will not accept an agency for any competitive newspaper; and that he will furnish news, editorials, columns, pictures and other editorial matter as directed by the "Editor", (9) that a net increase quota of 2,400 per annum should be attained, and that "Employee" will faithfully and promptly carry out all "Employer" directives necessary for fulfilling the quota, (10) "That nothing herein contained shall be deemed to authorize him to act as agent for or conduct business or incur liability in the name of or on account of the Employer". Thereafter follow certain provisions of the contract not particularly pertinent to the issue involved herein, providing for (11) right of supervision or inspection of "Employer", (12) right to discontinue sending papers upon default, and right to appoint another "employee" to service the territory, (13) termination date of

[1]. It is noted that the contract refers to a then weekly circulation of 8200 copies, whereas the answers to interrogatories state that the circulation as of April 1, 1955, was only 6300 copies.

contract[2] and automatic renewal provision, (14) territorial restriction on competitive employment within one year following cessation of employment with defendant, (15) agreement to be bound by Company rules, (16) vacation with pay, (17) salary ($75 per week), and expenses ($65 per week), plus bonus of 2¢ per copy sold in excess of 8,200 weekly. On its part, the defendant, "Employer", agreed: (18) to supply "Employee" with advertising and selling helps, such as window posters, placards, route books, stationery, and to assist in planning an advertising campaign to increase sales, all at "Employer's" expense, (19) to exert reasonable efforts to insure delivery of newspaper to areas in South Carolina, (19) to defray cost of transportation of newspaper to "Employee" or any other place suitable for pickup, (20) to furnish "Employee" a monthly account of papers sent to agents, distributors, and subscribers in South Carolina. The remaining portions of the contract are not relevant.

The contract alone furnishes persuasive evidence of the fact that defendant is "doing business" in South Carolina through a network of agents and distributors over which McCray serves as "managing agent". True it is that the contract contains a provision tending to negate the authority of McCray to act as agent or "conduct business" for defendant, but these words are meaningless if, in fact, McCray did serve as defendant's agent in conducting defendant's business in South Carolina, with the knowledge and approval of defendant. It could not be seriously controverted that McCray had authority to bind Afro-American on any advertising solicited by him in South Carolina. It is a fundamental principle that the actions of parties to a contract speak louder than the words of the instrument.

When we revert to the three essential functions of any newspaper business, we find that McCray was authorized by contract to: (1) gather news, (2) obtain advertisers and secure subscribers, and, (3) take complete supervisory charge of circulation throughout South Carolina.

The element lacking is, of course, the actual printing of the newspaper in South Carolina.

While it is true that defendant does not, in its own name, maintain an office in South Carolina, McCray does maintain such an office for the use and benefit of Afro-American. The managing agent, as this Court construes him to be, selects the distributors who, in turn, collect funds for defendant. It is interesting to note that McCray has obligated himself to see that the agencies, distributors and newsboys "do not fall into arrears", thus indicating defendant's practice to ship newspapers into the State on short-term credit. Save and except the printing of the paper, the maintenance of a bank account and the actual "in name" maintenance of an office, the defendant is *operating* its business in South Carolina. It is the opinion of this Court that these omissions are insufficient to permit defendant to escape possible liability for "doing business" in South Carolina.

Affidavits have been submitted from various individuals revealing that distributor contracts were negotiated by McCray; that newspapers are shipped to the distributor on credit; and that the affiant distributors are indebted to defendant in small amounts. These affidavits give further evidence of solicitation and sales of advertising, either through individuals in South Carolina or through correspondents who were permitted to deduct their commissions before remitting at their option. Such correspondents were paid for news items at the rate of 10¢ an inch and were also authorized to insert advertisements on their own credit, in which event bills were directed to the correspondents. Occasionally advertisements were inserted by South Carolina business concerns and billed direct. In practice, these so-called distributors are under the direct control of McCray and subject to his or-

---

2. The alleged libelous statements were within the term of the contract.

818

ders. The defendant did not see fit to file as an exhibit a sample copy of the individual contract with these "distributors", if any exists, but did submit forms as follows: (1) Agent's weekly report to The Afro-American, (2) Distributors' weekly report to The Afro-American, (3) Audit report of Afro-American for year ending 12/30/54.

Under the audit report it appears that papers sold in South Carolina are included under the "National Edition" and that only in the states of North Carolina and Virginia (each of which has a separate edition) has the circulation exceeded South Carolina. This audit report also reveals that there are so-called "dealers" operating in 34 counties and 31 separate cities or towns throughout South Carolina.

It is apparent that all distributors, corrspondents, etc., other than McCray, are paid on a commission basis and make all remittances to the Baltimore office.

The line of distinction in the numerous authorities dealing with newspapers and magazines "doing business" in various states is admittedly narrow. A summary of the following cases leads to the conclusion that certain publishing firms were not "doing business" within the state for the reasons stated.

In Whitaker v. Macfadden Publications, Inc., 1939, 70 App.D.C. 165, 105 F. 2d 44, the Court of Appeals for the District of Columbia had before it a factual situation in which defendant sold and shipped to, and collected payment from, an independent news company operating in the District. The news company resold to and collected from retailers and street vendors. Agent and four assistants, employed and paid by defendant, promoted sales of magazines among the street vendors, but did not solicit advertising or subscriptions, and collected no money. See also Kriger v. MacFadden Publications, Inc., D.C.Md.1941, 38 F. Supp. 472.

This Circuit, in Cannon v. Time, Inc., 4 Cir., 115 F.2d 423, held that the solicitation of and collection for subscriptions by news-stands and stores within the state did not constitute "doing business" by Time, Inc., and further stated that, even if defendant was regarded as doing business within the state, the business was not of sufficient volume or importance to warrant the inference that the corporations themselves were "present in the state" by their duly authorized officers or agents upon whom service of process could be had. It appears that Time, Inc., did no business in Virginia, except what business was transacted through a branch of the American News Company, an independent company. Any subscription obtained by American News was subject to acceptance by Time, Inc., at Chicago.

Where a state distributor bought magazines, not only from the defendant but from other publishers, and sold them to dealers in Texas, with only 3% to 5% of distributor's business being done with defendant, this was an insufficient showing that defendant was "doing business" in Texas. Street & Smith Publications v. Spikes, 5 Cir., 1941, 120 F.2d 895.

In another situation involving solicitation for sales of a law directory, including obtaining information as to the standing of attorneys in the community, the Court held that this did not constitute "doing business" in South Carolina. Merrimon v. Martindale-Hubbell, Inc., D.C.S.C.1940, 36 F.Supp. 182.

Creager v. P. F. Collier & Son Co., D. C.S.D.Tex.1929, 36 F.2d 783, presented a state of facts involving two corporations, P. F. Collier & Son Company and P. F. Collier & Son Distributing Corporation, the latter corporation being authorized to do business in Texas and was the employer of one Spaulding on whom process was served. The Court rejected the contention that Spaulding was the agent of P. F. Collier & Son Company, and further held that the "Son" company (as distinguished from the "Distributing" company) was not "doing business" in Texas.

Admittedly, the true test for ascertaining the status of a foreign corporation

allegedly doing business in a state is as stated in Green v. Chicago, Burlington & Quincy Rwy. Co., 205 U.S. 530, 27 S.Ct. 595, 596, 51 L.Ed. 916:

> "Its validity depends upon whether the corporation was doing business in that district in such a manner and to such an extent as to warrant the inference that, through its agents, it was present there."

A vast majority of the cases, holding that a corporation is not "present" within the state for the purpose of being amenable to process, were decided prior to International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 66 S. Ct. 154, 160, 90 L.Ed. 95. It is apparent that Chief Justice Stone, in his opinion, has charted a somewhat different course in arriving at the test to be applied, when he said:

> "It is evident that these operations establish sufficient contacts or ties with the state of the forum to make it reasonable and just, according to our traditional conception of fair play and substantial justice to permit the state to enforce the obligations which appellant has incurred there. Hence we cannot say that the maintenance of the present suit in the State of Washington involves an unreasonable or undue procedure."

While International Shoe concerned itself with the right of the State to recover unpaid contributions to the state unemployment compensation fund, the essential principles are closely analogous to the instant case. From a factual standpoint, there is far more reason to hold that Afro-American is doing business in South Carolina.

Since the decision in International Shoe Co. v. State of Washington, supra, the case of Polizzi v. Cowles Magazine, 1952, 345 U.S. 663, 73 S.Ct. 900, 97 L. Ed. 1331, was presented to the United States Supreme Court. Polizzi is cited in defendant's brief as authority for its

contention but reference is only made to the opinion of the Fifth Circuit, 197 F.2d 74. The reversal by the Supreme Court was based upon the misapplication of the venue statute with the majority of the Court (4 Justices) having this to say [345 U.S. 663, 73 S.Ct. 903]:

> "We express no opinion whether Respondent was 'doing business' in Florida within the meaning of the due process requirements set out in International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, because Respondent has not contended that the International Shoe test is not met."

It is interesting to note the opinion of Justice Black, concurred in by Justice Jackson, in which they dissent in part and concur in part with the majority. The dissent is by reason of the failure of the four Justices to decide the "doing business" question. It is rather obvious that the old rigid concepts of "doing business" have given way to the basic principles of fairness. Travelers Health Ass'n v. Commonwealth of Virginia, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154. Both in Travelers Health and Polizzi mention is made of the doctrine of *forum non conveniens*. Certainly it is true that, from the standpoint of convenience, the Eastern District of South Carolina is the forum for the trial of the Afro-American cases, rather than at Baltimore, Maryland, where no witnesses are available. Furthermore, from the standpoint of "fair play and substantial justice", it would clearly appear that South Carolina has jurisdiction. Adopting the reasoning in Clements v. MacFadden Publications, D.C.1939, 28 F.Supp. 274, 276:

> "To carry the present line of holdings to any greater extent than they now exist could easily result in a publication two thousand miles away destroying a man's reputation, whether he be great or small, and requiring him to come to unfriendly territory, perhaps, to effect his vindication in the courts of justice".

820

Reverting, for the moment, to the facts in Polizzi, we find that defendant hired a man to travel the State of Florida checking retail outlets, ascertaining conditions, securing proper position of publication on news-stands, occasionally putting up advertising displays in retail stores, and generally to increase circulation to the best of his ability. All of these factors were similarly done by McCray in behalf of Afro-American, although his duties did not stop there. In Polizzi the employed agent covered five states—McCray covered only South Carolina. The agent in Polizzi, one Briardy, had no authority to secure additional wholesalers or part-time subscription salesmen, and handled no money— McCray had such authority. Additionally, McCray and other agents, distributors and correspondents, had authority to secure advertising and did obtain same. Even if we were to examine only the opinion of the Fifth Circuit in Polizzi, there are sufficient distinctions in operational procedures to justify the conclusion that Afro-American is "doing business" in South Carolina through a network of agents, distributors and correspondents, under the control of a managing agent in the person of McCray.

It would be useless to include in this opinion the endless citation of authorities, pro and con, on the subject under discussion. Each case must, of necessity, resolve itself into a factual situation. Here we have a situation in which defendant prints and edits in Baltimore, Maryland, seven editions of a newspaper containing substantially the same general news items and advertising, but varying as to items of local interest and local advertising. *The South Carolina Edition is distributed solely in the State of South Carolina.* It would be rank injustice to permit defendant to publish libelous statements in the South Carolina Edition, circulated only in South Carolina, and then require the injured parties to seek relief in the State of Maryland.

The defendant's motion to dismiss is denied.